Peck, J.,
dissenting:
Upon an examination of the legal evidence in this record, I am of the opinjon that the claimant should recover. The only obstacle to a recovery, as 1 understand, arises from the improper admission of a letter marked “ Private,” which, a majority of the court assume, was written by the claimant to Jefferson Davis while he was president of the rebellious Confederate States. Inferences are drawn from this letter, and meaning applied to it, which may or may not be correct, since they rest only upon conjecture. The letter in question was first presented when the case was called for trial, which was the only intimation given of its existence.
The counsel for the claimant objected to the consideration of the letter by the court, because it was not any part of the record, and because it was not proved, in any way, to have been in the handwriting of the claimant. The majority of the judges, sitting as a court, metamorphosed themselves into witnesses, proceeded to inspect the letter, and declared that it was in the *434 proper handwriting of the claimant, and thereupon, without other evidence admitted it in evidence as genuine, against the remonstrance of her counsel. This inspection of the letter by the court, acting as witnesses, judges or jurors, in whatever special or transitional character they may prefer to be regarded, is the sole evidence in support of the genuineness of the letter known to me or to the record. The letter was then immediately returned to the defendants, who took it from the possession of the court and carried it I know not whither; but I, know it is neither in the record nor before the court.
The majority of the judges assumed to establish the authenticity of the letter by comparing the signature to it with that of the claimant to the petition; and then the letter took its departure from the court, and it vras no longer known to it. Upon this transitory examination, acting as experts, giving skilled evidence to themselves, the majority of the judges decided.
The court offered to continue the cause, in order to relieve the claimant’s counsel from the surprise to him by this, extraordinary presentation and proof of the letter. This proffered boon he did not accept. Why should he accept ? The mischief to him had already been accomplished. The court had decided the letter to be genuine, and if the judges who had done so could carry in their minds the recollection of the conclusion to which they had arrived by their own testimony, for a week or a month, they would probably retain their convictions for a much longer period of time, and doubtless until the case should be adjudicated. A continuance to him was to delay a judgment in the case, without a hope of success; the apple Of delay was certain to turn to ashes in his mouth. The case was vir- • tually prejudged.
It is claimed that because the court is the trier of the facts in the case, they may also make the facts, and furnish evidence of their personal knowledge, upon -which they may adjudge. I have always heretofore supposed that all triers of the fact, whether acting as judges or jurors, in every tribunal; no matter how constituted, were to try every fact by the evidence presented, and not by any personal knowledge unsupported by proofs. This character of evidence is defective in many respects; without stating all objections it is enoiigh to state that it is not delivered under oath, nor is it subject to cross-examin- *435 atiera. It is objectionable as evidence concealed from the party, and is not the best which the nature of the case admits of. It enables the court to strike before a party can be heard. I cannot see any reason in this, more than in any other case — unless it be that of convenience to one of the suitors — for not observing the established rules of evidence, which the good of society requires should be absolute and imperative, not admitting of any relaxation from considerations of convenience, expense, or partiality.
Suppose the claimant had offered proof against the genuineness of the letter, it would have weighed but little with the triers, whose minds or convictions had become sealed by their preconceived conclusions, derived from their ex-parte examination of signatures.
In the present state of the case, all protection to the claimant .by appeal is cut off. The court will find the fact of loyalty against her ■, how can it do otherwise, after having gone thus far'? That finding, however fatal to the case, will rest upon as wise a reason as that given by the poet for the knowledge of the traveled fool, who knew the exact color of the chameleon, viz: “ For sure I’ve seen, and ought to know.”
There is not, in my opinion, any warrant or even excuse for a resort to this unusual and dangerous practice. In all other courts, before a witness, proffered to prove handwriting by comparison merely, can be examined, if objection is made, the court decides, in the first instance, as to his ability or qualifications before lie will be permitted to testify. This court, exercising all the functions of judges and jurors, passes upon its own qualifications, and decides in the same breath that it has not only all requisite authority and skill, but that the handwriting is that of the claimant. Accepting in this irregular way, as complete evidence, a kind of proof which almost every other judge in Great Britain and this country has regarded as being only entitled to the lowest degree of credit.
Upon the question of the ability of experts and their qualifications, from observation or otherwise, to give satisfactory opinions, there is often much dispute and controversy ; after the court has decided as to these, the jury is left to weigh and consider all. The opinion or word of the expert does not settle the question conclusively. Not so in this court; here, where the skill and power áre decided to be in its own favor, the *436 examination bas been made, and the fact is established by an authority that will not tolerate dispute or investigation.
The verdict of a jury must be unanimous, and the evidence unust be such as will produce unanimity. ITere a majority, differing’ from a minority of the judges, control the decision, and that may be in cases where the minority is better qualified by experience and observation to pass upon the question of genuineness of signatures. A judge not so well learned in the law as his associates, may have superior skill in comparison of hands; and if the question of skill should be left for tne consideration of impartial tilers, the weight of his evidence might, by reason of his previous opportunities or acquirements, be held to outweigh that of all the others. Left to themselves to Aveigli, the majority might possibly overestimate their own ability and underrate that of any who differed from them. The opinions of. a majority upon matters of lawr are presumed to be superior, but it does not follow that they are so in matters of fact, and fact is the only question at issue here. No one of the judges of this court, in my opinion, is sufficiently skilled in handv'riting to be admitted to testify as an expert $ nor do I believe that either of them would feel justified in admitting any other of them to do so, were each presiding at nisi prius when a jury was to find a verdict which depended upon the question of the skill of the witness.
The majority of the court acted on the first impression, caused by the citation from Greenleaf’s Evidence, vol. 1, section 578, of this statement, “Where other writings, admitted to be genuine, are already in the case; here the comparison may be made by the jury, with or without the aid of experts.” He subsequently says, section 580, while discussing proof by comparison of hands: “In regard to admitting such evidence, upon an examination in chief, for the mere purpose of enabling the jury to judge of the hand waiting, the modern English decisions are clearly opposed to it.” He refers to some of these decisions in a note, and I cite some of them hereafter. In section 581, same volume, this author says, “If it icere possible to extract from the conflicting judgments” (that is, of the American courts) “ a rule which would find support from a majority of them, perhaps it would be found not to extend beyond this, that such evidence can be offered to the jury only when no collateral issue can be raised concerning them, which is only where the pa *437 pers are conceded to bo genuine, or are suck as the other party is estopped to deny.” This is the most favorable exposition of the law in this connection that Mr. Greenleaf can make. This author resides in Massachusetts, where, he states in a note to the section just quoted from, it has become the settled practice to admit any papers to the jury, whether relevant to the isisue or not, for the purpose of comparison of handwriting.”
This fact, and the desire which seems so natural to all persons from that State to approve and justify everything done in it, may have given a bias to Mr. Greenleaf’s opinions on this question; certain it is, they are quite peculiar. Mr. Greenleaf, however, admits that only Maine and Connecticut'have a similar practice, and adds that in New York, Virginia, and North Carolina comparison of hands is not allowed as evidence; and he might have extended the list of States excluding such testimony much beyond what he has done. I can add the States of Ehode Island and New Hampshire to the list.
Phillips, in his Treatise on Evidence, vol. 2, p. 257, treating of proof of handwriting by comparison of hands, says, “ On an issue whether an acceptance on a bill of exchange was signed by the defendant,, witnesses acquainted with the defendant’s writing being called to prove the negative, the plaintiff’s counsel projmsed, in cross-examination, to lay before each of the defendant’s witnesses a paper purporting to bear the signature of the defendant, and to inquire of each in turn his opinion, ‘ whether this was the defendant’s signature.’ This they proposed to do for the purpose of testing their knowledge of the defendant’s handwriting. Lord Denman rejected the evidence, and the Court of Queen’s Bench decided that the proposed paper, notbeing part of the proofs in the cause, teas not admissible.” The letter in this case is not part of the proofs in this cause. By the rules of the court all evidence must be in the record, and the brief of each party is required to contain an epitome or condensed statement of the evidence adduced, with a reference to the pages of the record where it is printed, clearly indicating that only such proofs are to he considered as are in and make part of the record. Following the quotation above made, Mr. Phillips says: “Whether the witness in such a case should answer in the affirmative or negative, and whether there should he some resemblance or none at all between the two signatures, it might .easily be shown, by plain reasoning, that *438 an inspection by the jury” (and I add Court of Claims) “aud a comparison of one signature with the other, could not probably afford any test fit to be relied on.
Mr. Evans in the 2d vol., p. 158, of his translations of Poth-ier’s Treatise on the Law of Obligations, lays down this rule: “It is now very clearly established by several authorities that the proof of handwriting must be made by persons having a previous knowledge of it, either from actually seeing the party write, or from correspondence; and that the comparison of an admitted with a disputed writing cannot be allowed, either by the inspection of the court and jury, or by the assistance of persons conversant with the handwriting, for the purpose of ascertaining its reality, or detecting its forgery.” This work of Mr. Evans, although not in common use by the profession, will be found, by those who choose to examine it, to be of tfye greatest value, both for its accuracy and learning.
Believing, as I do, that the withholding an actual right is not less an act of injustice than the commission of an actual wrong, I shall proceed further to examine this question. If Mrs. Medway has an actual right to the proceeds she seeks to recover, and has made out her case according to established law, she should not be baffled and defeated by the application of new and erroneous rules, which should not nor would be applied to the defendant under like circumstances.
Since the ignorance of law does not excuse, it should not be varied to suit particular cases or circumstances. The interest of society is best promoted by establishing authentic criteria of judicial certainty. The interests of the defendant, it is to be presumed, are always in the care of the best talent 5 aud if against this presumption, for any reason, the majority of the court believes its interests in this court are not properly protected, I do not feel it my duty1', for that or any other reason, to be eager to save it from loss, even if that should be a result, by a deviation from the established rules of evidence and a resort to others which are novel, not generally practiced and recognized, but which are pronounced doubtful in philosophy and morals by judges and text-writers. I shall not protect the defendant right or wrong, but only in the right.
Leaving the text-writers and turning to the English reported cases, I do not find any material difference between them. Wherever a reported case decided in Great Britain can be pro- *439 dnced, which recognizes that proof of handwriting may be made by comparison, it will be found to be either overruled or disregarded in practice. There are but very few such cases.
In Doe v. Newton, 1 Neville & Perry, p. 1, Lord Denman, C. J., after referring to the cases of Griffith v. Williams, reported in 1st Crompton & Jervis, p. 41, and Allesbrook v. Roach, in 1st Espinasse, 351, said: “It is, in my opinion, infinitely safer and better to abide by the rule which has existed up to the present time, that evidence of handwriting by comparison is inadmissible.” The other judges of the King’s Bench agreed with him.
In a note to the case of Solita v. Yarrow, on p. 134 of 1st Moody & Robinson’s Reports, so much relied upon by the majority of this court, Bolland, Baron, says : “ On a fuller recollection of the case of Griffith v. Williams, he thought it was not the intention of the court in that case, and certainly not; his own, to decide anything more than that the jury were at liberty to compare the disputed handwriting with that of documents, which were in evidence in the cause, independent of that question.”
■ In the case of Allport v. Meek, 4 C. & P., p. 266, on an application to prove an endorsement by comparing it with an acceptance of the bill, after the defendant had acknowledged that the acceptance was his, Tindal, J., stopped the counsel and said, “ You must call some ivitness to lay some evidence before the jury, on which they may decide.” Whereupon a non-suit was taken. It may be said by the majority of the court that in the case now under consideration some evidence had been placed before i't from which they might decide. I hope I shall be i>ardoned for saying that this is not apparent.
The only evidence before this court was that of the signature to the petition, which it was admitted was in the handwriting of claimant. There vras no other evidence of any description, and this is not the evidence contemplated by judges or text writers in this connection.
In 7 C. & P. Reports, p. 548, Bromage v. Rice, action, assumpsit on note, counsel for plaintiff tendered in proof a great number of other bills and notes, which bore the signature of the defendant, and which had been paid by him, so that the jury might compare the handwriting of those signatures with the signature in dispute in that case; aud cited the cases of Allesbrook *440 v. Roach, Griffith v. Williams, and Solita v. Yarrow, (named in this opinion.) Whereupon Littleclale, J., after having conferred with Pattison, J., said, “ I shall reject the evidence; the jury are not to compare any other writing with that in dispute, except documents which are otherwise in evidence in the cause.”
The opinion of Lord Kenyon in the case of Allesbrook v. Roach is often relied upon as authorizing' proof of handwriting by comparison; with what propriety may be determined by a reference to “Peake’s Cases,” where he said on the trial of the case of Macferson v. Thoytes, that “ comparison of hands is no evidence. If it were so, the situation of a jury who could neither write nor read would be a strange one, for it is impossible to compare the handwriting.” The reason assigned for rejecting the proof does not apply to this court, but docs ai^ply to a large number of jurors at this time, even in this countay$ but the rules of evidence were not designed for particular courts or cases, nor are they so flexible that this court may bend them at pleasure to adapt them to each particular case presented. Broome, among his Legal Maxims, p. 109, adopts, this: “ Every innovation occasions more harm and derangement of order by its novelty than benefit by its abstract utility.”
In a note to the case of Macferson v. Thoytes, already mentioned, to be found on the 30th page of Peake’s Cases, referring to the case of Brookbard v. Moodley, which was tried before Yates, J., he said, referring to proof by comparison of hands, “ I have no doubt to reject this evidence as not admissable. I do not know any case ichere comparison has been allowed to be evidence at all.” “ No trial cán be decided by opinion and speculation, but by evidence. ■ But where it is merely opinion on similitude of the writing collected from barely comparing them, the jury may compare them as well as anybody else; and any two people may think differently.” He rejected the evidence and would not allow it to go to the jury.
On the prosecution of Jackson, by Joseph Castor, esq., on an information for a libel, before Baron Efotham, reported in 4th Espinasse’s Reports, p. 117, this question of proof by comparison of hands was very elaborately discussed by G-arrow, so famous for his skill in the examination of witnesses, and Sergeant Best, afterward judge, assisted by two others, on the one side, and the attorney general, assisted by three others, on *441 tlie opposite side. After taking three weeks to consider the point, Baron Hotham said: “ I perfectly agree with the counsel for the prosecution that there is no difference, in point of evidence, whether the case be a civil or criminal case; the same rule must apply to both.” The evidence was rejected. See, also, at the end of the volume, which is the Hartford edition, by TJiomas Day, a note, in which Mr. Day has collected a number of authorities, in connection with proof by comparison of hands.
In his argument, Mr. Harrow, insisting that the same rules of evidence apply to criminal and civil cases, remarked: “ I invite anybody who has an appetite, to stand forward and contradict me.”
The indexes and text-books refer to numerous other cases, where like decisions were made; but I shall only quote from one other decision, viz, that by Lord Chancellor Eldon, to be found in the Reports of Vesey, junior, Sumner’s edition, pp. 438 and 474, 475, 476, and 477, in the case of Eagleton and Coventry v. Kingston, where, after commenting upon the cases decided at common law, where the question of comparison of handwriting was involved, and pronouncing decidedly against the admission of such evidence, he relates in his opinion the following anecdote of himself: “A singular circumstance, applicable to this point, happened to me. A deed was tried in Westminster Hall, stated to have been executed under circumstances throwing a good deal of blot upon the persons who had obtained it. The solicitor, who was a very respectable man, said he felt satisfaction that there were respectable witnesses. One was the town clerk of Newcastle, and I was the other. I could undertake, to a certainty, that the signature was not mine, having never attested a deed in my life. He looked back to my pleadings and wa's sure it was my signature, and if I had been dead would have sworn to it conscientiously. Suppose I had been out of the kingdom and had come into Westminster Hall during the trial, and had positively sworn that I never attested a deed in my life, would it not have been competent to the jury or the witness to say that it was a mistake Í That instance proves that testimony of handwriting must be open to the consideration of circumstances at common law.”
All dispute about the weight of authority in England in favor of proof by comparison of handwriting is settled by act of *442 Parliament, passed in 1854, 17tli and 18fcb Victoria, known as “ The Common Law Procedure Act,” which declares, see section 27, that “ comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall he permitted to he made hy toitnesses, and such writings, and the evidence of toitnesses respecting the same, may he submitted to the court and jury as evidence of the genuineness, or otherwise, of the writing in dispute.” Even this enactment leaves the present condition of the English law of evidence more than a spring-buck leap behind that established by the Court of Claims.
If the law in Great Britain had been as the majority of the court insist it was, at the time of the cases cited by them, no such enactment would have been made or considered necessary.
The policy of such an enactment, or of making proof by comparison of hands, I have nothing to do with. I find the law laid down for me by the Supreme Court as applicable to this question, and I obey it.
Giving regard to the American decisions upon the question of comparison of hands, I find in the 6th of Peters, 763, Strother v. Lucas, this positive declaration: u It is a general rule that evidence hy comparison of hands is not admissible where the witness has had no previous knowledge of the handwriting, hut is called upon to testify merely from a comparison of hands. There may be cases where, from the antiquity of the writing, it is impossible for any living witness to swear that he ever saw the party write, comparison of handwriting has been admitted. But these are extraordinary instances, arising from the necessity of the case, and which do not apply to the one before the court.”
Nor do they apply to the case now under consideration. There are doubtless many living witnesses who can testify to the handwriting of this claimant. As- for that, the defendants have the privilege of making her a witness in the case. The letter was written about sis years ago, and is in full youthful vigor, and there is no odor of antiquity about it. There are no circumstances connected with the letter which places it outside of the rule laid down by the Supreme Court. There is no necessity for establishing the authenticity of this letter by comparison; no excuse for a resort to short cuts or surprises, by which the claimant may be injured.
If the letter should defeat the claimant, so let it, otherwise *443 than by entrapping her by establishing new and doubtful rules of evidence.
Judge Washington, in the trial of one Sprague for counterfeiting, said: “I' confess for myself, I never was well satisfied with the reason of the general rule,-that comparison of handwriting is not competent evidence to go to the jury. Nevertheless, I consider the mle so settled for a long time in England; and the decision of this court in the case of Martin v. Taylor proceeded upon that ground.” (Washington C. C. Reports, p. 729.)
In the case of Myers v. Toscan, (3 New Hampshire, p. 47,) Chief Justice Richardson, in announcing the decision of the court, said: “We take it to.be a well-settled principle of law, that it cannot be left to a jury to determine whether a signature is genuine or not, merely by comparing it with other signatures that are genuine.”
“As it was submitted to the jury in this case, to decide by a mere comparison of handwriting, we entertain no doubt there must be a new trial.”
in 9th Cowen’s Reports, pp. 94 and 112, Jackson v. Phillips, Savage, Ch. J., says: “In Tilford v. Knott, (2 Johnson’s Cases, 211,) Kent, J., said: “ Et is usual for witnesses to prove handwriting from previous knowledge of the hand, derived from having seen the person write, or from authentic papers received in the course of business. If the witness has no previous knowledge of the hand, he cannot then he permitted to decide it in court from a comparison of hands. The same rule is admitted in Jackson v. Van Duzen, (5 John. R,, 155,) and it is there said, where a different practice has prevailed with us I presume it will be found that the comparison, either by witnesses or by the jury, has been by consent.”
In Jackson v. Van Duzen, (5 Johnson, pp. 144-155,) just referred to, Van Ness, J., said : “It is supposed that this was an attempt on the part of the plaintiff to prove Wheeler’s handwriting by what is termed 1 comparison of hands,’ which it is contended, according- to the prfesent settled law, is not competent testimony.” “ I hy no means. intend to controvert the rule as stated ; but according to my understanding of the evidence given, it has no application to this case.” See, also, Osgood v. Dewey, (13 Johnson, p. 239.) I might multiply authorities from the State of New York, sustaining the view I have taken of this rule of evidence, to almost any extent. 4th Kernan, (14 New *444 York Eeports, p. 439.) Van Wyck v, McIntosh. This case is cited in the opinion of the court. It was decided in A. D. 185G. Judge T. A. Johnson there says: “ Our courts have adopted the English rule, which excludes such comparisons by the jury as evidence to prove or disprove the handwriting of a party, and the opinion of witnesses founded thereon.”
Judge Nicholas, of Kentucky, for the Court of Appeals, said: u The defendants offered in evidence a paper purporting to have been signed by the plaintiff, proffering to prove his signature to other writings, and then by comparison to show that this also was signed by him. The court properly refused to permit it to go in .evidence upon such proof.” He then stated that in cases of ancient writings, where it is impossible to find living witnesses, and sometimes in corroboration of other proof, comparison has been permitted; and adds, 11 .But alone and without other proof \ the general rule is not to admit it.”
If there are those who are not convinced by the authorities I have cited, that mere comparison of hands does not authorize a court or jury to come to a conclusion as to the fact of the genuineness of a signature, I would refer them to note 256, beginning on page 478 of Cowen & Hill’s Notes to Phillips’s Evidence, 4th vol. It will there be found that the learned authors of those notes, after citing all the decisions upon this question, conclude that mere unaided comparison of handwriting will not authorize a jury to find in favor of the genuineness of any specimen presented.
This conclusion is supported by Leigh’s Eeports, vol. 1, p. 22. Also by reported cases in the courts of the United States for the districts of Pennsylvania, South Carolina, and Ehode Island.
After a somewhat careful examination of many authorities which I have not quoted, I am not permitted to believe that any proof by a mere comparison of handwriting should be regarded as evidence by any court or jury. Especially in this court should individual knowledge, unsupported by evidence, be excluded from its consideration. No evidence made by and for itself should lead it to conclude in favor of that party which is always a defendant, and always pays the salaries of the judges.
Feeling, as I do, that the practice of introducing evidence at the hearing which is not made any part of the record, and which *445 is granted to but one of the parties to the suit, smacks so strongly of favoritism, I abhor it. Such practice has many objections, but the greatest of all, and most to be deplored, is the fatal objection — that it brings the court under the not unreasonable suspicion of partiality. Should a claimant offer a paper in evidence under similar circumstances, and then whisk it out of court, where it should remain for the inspection of both parties, asking the court, from a mere transitory inspection of it, to form its opinion of its merits, and keep that opinion always in memory, his conduct might well be regarded as offensive, and the offered evidence would receive but little consideration.
As I have already said, this is a new practice, and I am one of those who do not believe that everything new is good, especially in matters depending upon the immortal rules of justice, which have not11 any variableness or shadow of turning.”
Broome, in his Legal Maxims, p. 96, after stating that u the practice of the court is the law,” comments as follows: “ Where a practice has existed, it is convenient to adhere to it, because it is the practice, even though no reason can be assigned for it; for an inveterate practice in the law generally stands upon principles that are founded in justice and convenience. Hence, if any proceeding in action be informal, or be not done in the time limited for it, or in the manner prescribed by the practice of the court, it may be set aside for irregularity.” So I would and do condemn the action of the court in this case,.in making proof for itself by comparison of hands, in disregard of its rules regulating' the manner in which all evidence shall be placed before it, as being so irregular that it deserves to be set aside.
In the opinion of the majority of the court, reference is made to two letters; I never saw or heard of but one; and the correctness of any opinion cannot be verified by a reference to the record, for that does not contain any letter. The inferences drawn from the contents of the letter may or may not be correct ; I do not dispute them ; but as the letter is not in evidence the record does not furnish any justification in support of them.
If the defendant could prove the genuineness of the letter, it should have asked a continuance for the purpose, to which it is not probable there would have been any objection.
I will add here that by chapter 21, section 1, of an act approved April 20,1871, Congress legislated upon this matter, and *446 made provision that the papers, &c., “ relative to transactions of or with the late so-called government of the Confederate States, or the government of any State lately in insurrection,” might be resorted to for information by the board of commissioners of claims created by act approved March 3, A. D. 1871. All which shows that Congress had knowledge of the existence of such documents, and was willing they should be used in other investigations in relation to claims, but not by the Court of Claims; and the documents or papers so to be used did not include private correspondence with rebels, great or small, but only those which relate to “ transactions ” rvith the so-called “ government” of the Confederate States, or of the separate States making a part of, those in rebellion.
If it were possible to state the difference between right and wrong in numbers, it would, in my opinion, be a million times better for the defendant that this claimant, though ever so disloyal, should recover upon the caso she has made, than that this court should disregard either the settled law or its own rules to prevent a recovery. The mischief of such an example cannot be computed. The honor and dignity lost to a great government by the triumph of carrying a petty point over this claimant is a sacrifice that cannot well be made. It is a poor equivalent for abused law or offended justice.
I think the claimant, upon the legal proofs made in the record, should have judgment.
When this dissenting opinion was written, I had not seen or heard the opinion of the court.
I find from it that the petition of the claimant is dismissed because of some other letter written by her, different from that quoted in the opinion, which was never seen by the court, nor its contents made known to it; wherein the claimant had previously u made an offer of service,” not to the rebel president as such, but to Jefferson Davis. What the proffered service was, is only a matter of conjecture; it may or may not have been for his personal benefit, but for that of the confederacy. It may have been for some terrible mischief, or it may have been to serve him as housekeeper or nurse, or in any other of the multifarious' occupations of womanhood, which would not give aid and comfort to the rebellion, which before then had reached a state of despair, although he was at the head of it, unless this should be done by baking his bread, washing his clothes, *447 or nursing- himself or his family; all which conjectures I clo not think should be started, nor are they, when started, such legal presumptions as should be regarded as sufficient to overthrow the positive testimony in support of her claim, which the court concedes, but for the unknown letter, is sufficient to entitle her to a favorable judgment.
The court says that the mysterious and unproduced letter of the 2d January, 1805, of which and its contents there is not even a semblance of proof in the case, “ was an act of aid and comfort to the rebellion.” It may be that it was; but how does the court come to this knowledge ? The whole thing is a chimera. She is denied justice for some unknown reason.
The embarrassment of the court arises from omitting to compel the defendant to make the proper proofs, according to established rules.
I cannot, for the convenience of the defendant, or to excuse its negligence, see what is not to be seen, or make a whale of a cloud, or a cloud of a whale. My idea.of duty does not lead me thus far. If the United States is not willing to be tried by the same rules of law that are applied between man and man, this court had better be abolished.
Lotiing-, J., was absent at the trial of this case, and took no part in its decision.